IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RANDY GATZ, individually and as Guardian and  )
next best friend of A.R., a minor,  )
  )
      Plaintiff,  )    Case No.  24 C 3805
  )
    v.  )
  )    Judge Robert W. Gettleman
TIFFANY FABIAN, DEOREA SUNDAY,  )
SHANTINA GRIFFIN, JOSE CHACKO,  )
CONTONIA STONE-WOOTEN, LAURA  )
PIASKOWY, EVELYN MARTINEZ,  )
STEPHANIE MILLER, MELISSA STRONZ,  )
LINDA LENTZ, EMILY CAPONE and JOHN  )
GAC,  )
  )
      Defendants.  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Randy Gatz is the maternal grandfather and acting guardian of "A.R.," a minor.[1]

Plaintiff has filed a sixteen-count complaint against twelve individuals that alleges that each of

them worked for the Illinois Department of Children and Family Services ("DCFS"). Plaintiff

alleges that each defendant knew or suspected that A.R. was at risk of physical abuse or neglect

while in the custody of her biological mother and maternal grandmother. Yet, he alleges, each

created and increased A.R.'s risk for abuse by performing sham investigations and declaring

repeated claims of abuse and neglect as unfounded. This, he says, emboldened and encouraged

A.R.'s abusers to physically abuse and neglect her. Plaintiff alleges in Count I that every

defendant is liable under 42 U.S.C. § 1983 because their actions—or lack thereof—violated

A.R.'s due process rights under the Fourteenth Amendment. Plaintiff alleges in Count II that

---

[1] The court refers to the minor by her initials. *See* Fed. R. Civ. P. 5.2(a).

half of the defendants are also liable under section 1983 for the same actions (or lack thereof) taken after he became co-guardian of A.R.   Plaintiff then asserts in the remaining counts Illinois state law tort claims—for negligence and intentional interference of emotional distress—against the defendants.

Eleven of the twelve defendants here (the "DCFS defendants") have moved to dismiss the entire complaint against them for failure to state a claim.[2]   They argue that Supreme Court precedent forecloses the section 1983 claims against them, that they are alternatively entitled to qualified immunity under those claims, and that the remaining state law claims are barred by state sovereign immunity.   For the below reasons, the court grants the DCFS defendants' motion to dismiss.

## **BACKGROUND**

## **Factual Background**

Plaintiff sets forth the following allegations in his complaint.   A.R. was born in 2016 and placed in the custody of her biological mother, Marisa Gatz ("M.G.").   In July 2019, DCFS opened its first investigation relating to A.R. based on a hotline call that alleged that M.G. was abusing and neglecting A.R.   The call alleged that: A.R. had inadequate shelter, clothing, sleep, and medical care; was surrounded by family members with drug issues; and was being physically and verbally abused (even sustaining a black eye).

Defendant Tiffany Fabian ("Fabian") was assigned to investigate, she "conducted a sham investigation," "omitted information from her report, and/or inserted false information in the

---

[2] The remaining defendant, Emily Capone, has independently moved to dismiss Counts I and II against her.

report of her investigation, and/or otherwise created an inaccurate report." Fabian "knew or suspected A.R. was at risk for and subjected to abuse and neglect" but "consciously ignored and failed to stop the abuse." Fabian "falsely categorized the July 2019 allegations of abuse as 'unfounded' due to insufficient evidence, instead referring M.G. to community-based services," and "despite M.G. completing a drug test which indicated that she was positive for opiates, for which she was not prescribed, thus corroborating the reporters' concerns that A.R. was surrounded by family members abusing drugs."

Pursuant to DCFS procedure, Fabian then met with her supervisor, Defendant Deorea Sunday ("Sunday"), about her findings, and thereafter issued a final investigative report and closed her investigation. Sunday "knew or should have known" that Fabian conducted a sham investigation and "had included false information and/or omitted information from her report and/or otherwise created an inaccurate report." "Yet with deliberate and reckless indifference," Sunday approved "and/or" directed Fabian's conduct by agreeing with Fabian's findings and concluding that the allegations of abuse and neglect were "unfounded." M.G. was notified of the result of the report.

In February 2020, DCFS opened its second and third investigations related to A.R., based on multiple hotline calls reporting that M.G. and A.R.'s maternal grandmother, Kim Marmitt ("Marmitt"), were abusing and neglecting A.R. The allegations included: that A.R. was being inadequately supervised and clothed; that she always looked sick and wore the same outfits; and that she was experiencing environmental neglect due to suspected drug dealing and domestic disputes around Marmitt's residence.

3

Defendant Shantina Griffin ("Griffin") was assigned to investigate these two reports. Griffin purportedly contacted the police to request police reports on A.R.'s family, but ultimately failed to make the request or to otherwise review any such reports. Had she done so, she would have discovered roughly 15 reports over disturbances involving M.G., Marmitt, or Jacob Gatz ("Jacob"), A.R.'s maternal uncle who resided in Marmitt's home and "whom DCFS knew abused illicit substances."

Griffin "conducted a sham investigation," "omitted information from her reports, and/or inserted false information in the reports of her investigations, and/or otherwise created inaccurate reports." She "knew or suspected" A.R. was at risk, yet "consciously ignored and failed to stop the abuse." She further "falsely categorized the February 2020 allegations" as "unfounded."

Griffin thereafter met with her supervisor, defendant Contonia Stone-Wooten ("Wooten"), about her findings, and then issued a final investigative report on her investigations and closed her investigations. Wooten "knew or should have known" that Griffin "conducted a sham investigation that included false information and/or omitted information from her report, and/or otherwise created an inaccurate report." "Yet, with deliberate and reckless indifference," Wooten approved "and/or" directed Griffin's conduct by agreeing with Griffin's findings and concluding that the February 2020 allegations of abuse and neglect were "unfounded." M.G. and Marmitt were notified of the results of the reports.

In March 2020, DCFS opened its fourth investigation related to A.R. based on a hotline call reporting that M.G. was neglecting A.R. It was determined that M.G. was arrested for possessing drug paraphernalia with A.R. present. M.G was "indicated" (meaning that a DCFS investigator conducted an investigation and determined that there was credible evidence that a

child was abused or neglected) two months later on May 4, 2020, because, by placing A.R. in close proximity to drugs, M.G. posed a substantial risk of physical injury and neglect to A.R.

As of March 5, 2020, "M.G. was no longer allowed to reside in the same home as A.R." and on March 20, 2020, M.G. signed a "DCFS Appointment of Short-Term Guardianship" under 755 ILCS 5/11-5.4, whereby she gave up her own guardianship of A.R. and designated Marmitt as A.R.'s short-term guardian. Griffin was assigned to investigate the allegations against M.G. and ensure that the short-term placement with Marmitt was appropriate. But she "began to conduct a sham investigation." Griffin "knew or suspected that A.R. was at risk for and subject to abuse while in the custody of Marmitt," but "consciously ignored and failed to stop the abuse." Griffin conferred with Wooten about her findings. Wooten "knew or should have known" that "Griffin conducted a sham investigation, and knew or suspected that A.R. was at risk" of abuse if placed in Marmitt's custody, yet still approved "and/or" directed Griffin's conduct and placement of A.R. with Marmitt. By "ignoring Marmitt's documented history of abusing and neglecting A.R.," Griffin and Wooten "knew or should have known that Marmitt's abuse and neglect of A.R. would continue when they made the decision to place A.R. with Marmitt and allowed her to be appointed as A.R.'s short-term guardian."

In May 2020, DCFS opened its fifth investigation related to A.R. based on a hotline call reporting that M.G. was residing with Marmitt and A.R. and was physically abusing A.R. and using drugs in A.R.'s presence. The allegations also included that M.G. was found unresponsive due to a drug overdose and that M.G., Marmitt, A.R., and Jacob were all residing at the home.

Defendant Laura Piaskowy ("Piaskowy") was assigned to investigate the allegations against Marmitt. Piaskowy "conducted a sham investigation," "omitted information from her report, and/or inserted false information in the report," "and/or otherwise created an inaccurate report," and "falsely categorized the May 2020 allegations of abuse as 'unfounded.'" Had she properly investigated, she would have discovered that Jacob was illegally residing at the home. Piaskowy "knew or suspected" that A.R. was at risk in being in the care of Marmitt, yet "consciously ignored and failed to stop the abuse and neglect."

Piaskowy met with her supervisor, defendant Evelyn Martinez ("Martinez"), about her findings, and then issued a final investigative report and closed her investigation. Martinez "knew or should have known" that Piaskowy conducted a sham investigation that included false information in her report "and/or" omitted information from her report "and/or otherwise created an inaccurate report." "Yet, with deliberate and reckless indifference," Martinez approved "and/or" directed Piaskowy's sham investigation and issuance of a report that concluded that the May 2020 allegations were "unfounded." Marmitt was notified of this result.

In October 2020, plaintiff, A.R.'s maternal grandfather, was appointed as co-guardian of A.R.

In November 2020, DCFS opened its sixth investigation related to A.R., based on a hotline call reporting that A.R. was being abused and neglected while in Marmitt's custody. The allegations included: that A.R. witnessed domestic violence between Marmitt and her boyfriend; that Marmitt, M.G., and Jacob were using drugs in front of A.R.; that M.G. was impermissibly residing in Marmitt's home with A.R.; that Jacob punished A.R. by locking her in

the bathroom, alone, with the lights off; that Marmitt was aware of this punishment, but did not

stop it; and that Marmitt was abusing A.R. by hitting A.R. with a wooden spoon.

Defendant Stephanie Miller ("Miller") was assigned to investigate. Had Miller properly

investigated, "she would have discovered that Jacob was not on the lease for Marmitt's residence

and was illegally residing in the home with Marmitt and A.R." Miller erroneously determined

that some of the allegations—that Jacob locked A.R. in the bathroom and that Jacob's behavior

toward A.R. was abusive—were "unfounded," but she did find that Marmitt should be

"indicated" for the allegations relating to Marmitt placing A.R. in an environment that put her at

substantial risk of physical injury. Miller "knew and documented that A.R. was at risk for abuse

and neglect while in Marmitt's custody," yet "consciously ignored and failed to stop the abuse

and neglect by allowing A.R. to remain in Marmitt's custody."

Miller met with her supervisor, defendant Jose Chacko ("Chacko"), about her findings

and then issued a final investigative report and closed her investigation. Chacko "knew or

should have known" that Miller conducted a sham investigation that included false information

in her report "and/or" omitted information from her report "and/or otherwise created an

inaccurate report." "Yet, with deliberate and reckless indifference," Chacko approved "and/or"

directed Miller's conduct by agreeing with Miller's findings and concluding that "the sum of

allegations of abuse and neglect reported in November 2020 were 'unfounded.'" Chacko "knew

and reviewed documentation that A.R. was at risk for substantial risk of physical" or

environment injuries "at the hands of Marmitt, but condoned and concurred with . . . Miller's

recommendations that A.R. remain in an abusive environment." Marmitt was notified of the

result of the report that the allegations against Jacob were unfounded, and that she was

"indicated" for some abuse and neglect allegations. Marmitt was referred for DCFS Intact services (a program for at-risk families that seeks to ensure the safety and well-being of children without the need for protective custody by providing families with in-home service like counseling), and A.R. was allowed to remain in her care and custody.

In January 2021, DCFS opened its seventh investigation related to A.R., based on a hotline call reporting that "M.G. and Marmitt were drug addicts and that A.R. was surrounded by individuals using drugs." Miller was assigned to investigate M.G. and Marmitt's abuse and neglect of A.R. "Despite credible allegations of abuse and neglect," Miller "conducted a sham investigation," "omitted information from her report, and/or inserted false information in the report of her investigation, and/or otherwise created an inaccurate report," and "falsely categorized the January 2021 allegations of abuse as 'unfounded.'" Miller "knew or suspected A.R. was at risk for and subject to abuse and neglect while in the custody and care of Marmitt, who was impermissibly allowing M.G. to also have custody and care over A.R., and consciously ignored and failed to stop the abuse."

Miller met with her supervisor, Chacko, about her findings and then issued a final investigative report and closed her investigation "into the May 2020 [sic] allegations." Chacko "knew or should have known" that Miller conducted a sham investigation that included false information in her report "and/or" omitted information from her report "and/or otherwise created an inaccurate report." "Yet, with deliberate and reckless indifference," Chacko approved "and/or" directed Miller's conduct by agreeing with Miller's findings and concluding that the January 2021 allegations were "unfounded." M.G. and Marmitt were notified of the result of report.

8

Defendant Emily Capone ("Capone") was assigned as Marmitt's Intact caseworker. "Despite credible allegations of abuse and neglect," she "conducted a sham investigation each and every time that she met with Marmitt and/or A.R." Capone "knew or should have known that A.R. was at risk for" abuse and neglect while in Marmitt's custody because "M.G. was impermissibly residing in the home, and there were multiple allegations of drug abuse by Marmitt." But Capone "consciously ignored and failed to stop the abuse and neglect." Capone "omitted information from her report, and/or inserted false information in the report of her investigation, and/or otherwise created an inaccurate report." Had Capone properly investigated, she would have discovered that Marmitt was found unresponsive and transported via ambulance to receive medical attention for a suspected drug overdose, and that "A.R. was present in the home while Marmitt was unresponsive, and while emergency personnel were on scene." As a result of Capone's sham investigation and reporting, A.R. remained with Marmitt and thus at substantial risk of injury.

In April 2021, DCFS opened its eighth investigation related to A.R. based on a hotline call reporting that M.G. and Marmitt were abusing and neglecting A.R. The allegations included: that A.R. was residing in a neglectful environment that put her at risk of physical injury and was injurious to her health and welfare; that A.R. witnessed an altercation between M.G., Jacob, another woman; that Marmitt and Jacob were abusing drugs; that Marmitt hit A.R. with a wooden spoon and locked her in an unlit bathroom; and that Jacob kept an unregistered firearm unsecured in his bedroom closet while living in the same home as A.R. Defendant Melissa Stronz ("Stronz") was assigned to investigate. She determined erroneously that the allegation that A.R. was locked in an unlit bathroom and hit with a wooden spoon were unfounded, even

9

though someone had previously reported these same forms of abuse.   She also failed to properly investigate allegations about Jacob.   Had she properly investigated, she would have discovered that he was illegally residing in the home and that he kept an unregistered firearm in his bedroom closet.

Stronz "did find that the allegation of substantial risk of physical injury/environment injurious to health and welfare by neglect to be indicated as to M.G."—"due to M.G. engaging in a physical altercation in the presence of A.R"—and to be indicated as to Marmitt—"due to her blatant disregard for the health and safety of A.R. in her parenting of A.R., and for allowing M.G. to be in the home with A.R."   Stronz "knew and documented that A.R. was at risk for and subject to abuse and neglect while in" Marmitt's custody, "but consciously ignored and failed to stop the abuse by allowing A.R. to remain in her custody.

Stronz met with her supervisor, Chacko, about her findings and then issued a final investigative report and closed her investigation.   Chacko "knew or should have known" that Stronz conducted a sham investigation into those allegations that she deemed unfounded and included false information in her report "and/or" omitted information from her report "and/or" otherwise created an inaccurate report."   "Yet, with deliberate and reckless indifference," Chacko approved "and/or" directed Stronz's sham investigation and report.   Chacko also "knew and reviewed documentation that A.R. was at substantial risk of physical injury/environment injurious to health and welfare by neglect at the hands of Marmitt and M.G., but condoned and concurred with Defendant Stronz's recommendations that A.R. remain in an abusive environment."   M.G. and Marmitt were notified of the result that some of the allegations were unfounded and some were indicated.

10

In February 2022, DCFS opened its ninth investigation related to A.R. based on a hotline call reporting that Marmitt was abusing and neglecting A.R. The allegations included: that "A.R. residing in a neglectful environment that put her at a substantial risk of physical injury" and that "was injurious to A.R.'s health and welfare"; that "Marmitt was allowing Jacob into the home, despite having an active protective order against him, and his suspected drug abuse"; that "Marmitt was not taking A.R. to school"; and that "Marmitt was abusing drugs." Defendant Linda Lentz ("Lentz") was assigned to investigate. Lentz "conducted a sham investigation." Had Lentz properly investigated, she would have learned that the police responded to Marmitt's residence for a well-being check—after it received reports of her walking in the street appearing displaced and homeless; that the police arrested Marmitt after a domestic dispute in which she stabbed Jacob; and that Marmitt had a pending order of protection against Jacob. Lentz "omitted information from her report, and/or inserted false information in the report of her investigation, and/or otherwise created an inaccurate report," and "falsely categorized the February 2022 allegations of abuse as 'unfounded.'" She "knew or suspected A.R. was at risk for abuse and neglect while in" Marmitt's custody yet "consciously ignored and failed to stop the abuse."

Lentz met with her supervisor, defendant John Gac ("Gac"), about her findings and then issued a final investigative report and closed her investigation. Gac "knew or should have known" that Lentz conducted a sham investigation and included false information in her report "and/or" omitted information from her report "and/or otherwise created an inaccurate report." "Yet, with deliberate and reckless indifference," Gac approved "and/or" directed Lentz's sham investigation and report. Marmitt was notified of the result of the report.

11

In April 2022, a mandatory reporter from an elementary school reported A.R.'s absence from school and concerns about Marmitt's care of A.R.   The mandatory reporter was informed that DCFS would not be opening up a new case, but that DCFS would inform A.R.'s then current caseworker, Capone.   Capone failed to follow-up on the allegations.

In June 2022, the police were dispatched to Marmitt's residence.   During the investigation, an officer discovered that A.R. had a bruise on her left calf that "resembled a shoe print."   As a result, the officer took photographs and completed a DCFS report.   No caseworker followed-up on the police report and no investigation was opened.

In August 2022, DCFS opened its tenth and final investigation related to A.R.—and "took protective custody of A.R."—after the police were "called to her home because A.R. discovered Marmitt unresponsive in the home due to a suspected drug overdose."   Allegations in this final report included that "A.R. was forced by Marmitt and others to remain in her room while Marmitt and others were using drugs."   Marmitt was hospitalized and later died from a drug overdose.

In September 2022, plaintiff gained sole guardianship of A.R.

## Procedural Background

In May 2024, plaintiff filed this lawsuit, asserting two federal claims (Counts I and II) and fourteen Illinois state law claims (Counts III-XVI).   He alleges in Count I that all of the defendants violated A.R.'s Fourteenth Amendment due process rights and are liable under 42 U.S.C. § 1983.   According to plaintiff, each of them, acting under color of law, "emboldened and encouraged A.R's abusers to physically abuse and neglect her, depriving her of her constitutional right to life, liberty and the pursuit of happiness," and "directly caused" A.R. to

12

suffer physical and mental injuries and "caused her next-of-kin to suffer injuries, including grief, sorrow, and mental suffering."

As for Fabian, Griffin, Piaskowski, Miller, Stronz, Capone, and Lentz, plaintiff alleges that they each were employed by DCFS and, "while acting as DCFS Child Protective Investigators and/or Intact caseworkers and working under color of law," "conducted sham investigations, omitted information and/or falsified information in reports and/or categorized reports of child abuse and neglect of A.R. as 'unfounded,' and closed investigations into the abuse and neglect of A.R., despite suspicion and/or documented evidence or knowledge of A.R's risk of and actual abuse and neglect at the hands" of M.G., Marmitt, "and other individuals in the home." These acts, he alleges, "created and/or increased the risk of danger to A.R." and were the proximate cause of the constitutional violations.

As for Sunday, Stone-Wooton, Martinez, Chacko, and Gac, plaintiff alleges that they each were employed by DCFS and, while acting as DCFS Child Protection Supervisors and/or Public Service Administrators and under color of law," "had knowledge of a pattern of misconduct by" Fabian, Griffin, Piaskowy, Miller, Stronz, Capone, and Lentz; suspected or knew of a substantial risk that they would violate A.R.'s rights; and deliberately, or with reckless indifference, chose a course of action that allowed the abuse and neglect to continue.

In Count II, plaintiff appears to assert another section 1983 claim against Miller, Capone, Stronz, Lentz, Chacko, and Gac as it relates to plaintiff himself based on the same conduct that occurred after he was appointed A.R.'s co-guardian in October 2020.

Plaintiff summarizes his section 1983 claims as follows: "Each of the Defendants knew of or suspected that A.R. was at risk of physical abuse or serious neglect while in the custody and

13

care of" M.G. and Marmitt, yet each "created and increased A.R.'s risk for abuse" by "performing sham investigations, declaring repeated claims of abuse and neglect as unfounded," and thereby "embolden[ing] and encourag[ing] A.R.'s abusers to physically abuse and neglect her."

As for Counts III-XIV, plaintiff asserts an individual Illinois state law negligence claim against every defendant. In Counts XV and XVI, he asserts an Illinois state law claims for intentional infliction of emotional distress against all defendants for the emotional distress he says that A.R. suffered and for the emotional distress that he says he himself suffered.

The DCFS defendants have moved to dismiss all counts against them for failure to state a claim. They have also separately moved to stay discovery pending resolution of their motion to dismiss. Plaintiff opposes both motions.

## DISCUSSION

A valid complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of a complaint is to provide notice to the defendant of what the claim is and the "grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957). To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must provide the defendant with fair notice of a claim's basis and must be facially plausible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the possibility

14

of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief."  Id. at 679 (cleaned up).

"In reviewing the sufficiency of a complaint under th[is] plausibility standard," the court "accept[s] the well-pleaded facts in the complaint as true" but "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  Alam v. Miller Brewing Co., 709 F.3d 662, 666 (7th Cir. 2013) (citation omitted).   While this standard does not require "detailed factual allegations," a complaint that merely "tenders naked assertions devoid of further factual enhancement" is insufficient and fails to properly state a claim for relief.   Iqbal, 556 U.S. at 678 (cleaned up); see also Zablocki v. Merchants Credit Guide Co., 968 F.3d 620, 623 (7th Cir. 2020) (on motion to dismiss the court "need not accept as true statements of law or unsupported conclusory factual allegations" (citation omitted)).

The DCFS defendants first argue here that plaintiff's section 1983 claims (Counts I and II) must be dismissed because plaintiff has not alleged a cognizable due process claim or, alternatively, because they are entitled to qualified immunity on those claims.   They then argue that the remaining state law claims should be dismissed as barred by Illinois state sovereign immunity—not before noting, though, that if the court dismisses the federal counts, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."   (Quoting Ludlow v. Northwestern Univ., 125 F. Supp. 3d 783, 794 (N.D. Ill. 2015)).

### The section 1983 claims

The court begins with the section 1983 claims.   Section 1983 provides a cause of action

15

against a person, who, acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws of the United States." Livadas v. Bradshaw, 512 U.S. 107, 132 (1994) (cleaned up). It provides the procedural vehicle "for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (citation omitted). A plaintiff asserting a section 1983 claim must identify the specific constitutional right that was infringed. Id. at 394. It must also show that the state actor was "personally responsible for the constitutional deprivation." J.H. ex rel. Higgin v. Johnson, 346 F.3d 788, 793 (7th Cir. 2003) (citations omitted). "This limitation mandates that a supervisor can be held liable under § 1983 only if he or she had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." Id. (cleaned up).

Plaintiff here asserts in his complaint that defendants are liable under section 1983 because they allegedly violated A.R.'s due process rights under the Fourteenth Amendment by emboldening and encouraging A.R.'s abuse. The DCFS defendants argue that plaintiff cannot allege a due process claim because any such claim is barred under the Supreme Court's decision in DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189 (1989). They further argue that, even if the claims were cognizable, the DCFS defendants are at least entitled to qualified immunity on them.

### DeShaney

Starting with the DeShaney due process issue, the Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In DeShaney, the Supreme Court

16

made clear that the Clause provides "a limitation on the State's power to act." 489 U.S. at 195. It generally does not, the Court explained, "impose an affirmative obligation on the State to ensure that those interests [in life, liberty, or property] do not come to harm through other means"—like through the actions of a private actor—or otherwise "guarantee . . . certain minimal levels of safety and security." Id. "As a general matter, then," the "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197.

DeShaney enunciated the above principles in a case that both parties here agree had facts that were—at the very least—analogous to those alleged in this case. Indeed, the DeShaney Court analyzed whether county social workers could be held liable for due process violations brought on behalf of a young child who was severally abused by his father. Id. at 191. The social workers first became aware that the child might be a victim of abuse after a complaint was filed alleging that his father had hit him, causing marks. Id. at 192. The county social services department interviewed the father, who denied the accusations, and pursued the matter no further. Id. In a second incident, the child was admitted to a hospital with bruises and abrasions, and the examining doctor notified the social services department about suspected abuse. Id. The department immediately obtained an order placing the child in the hospital's temporary custody, but three days later determined that there was insufficient evidence of abuse to keep him in custody. Id. They did, however, take measures to protect the child, including enrolling him in a preschool program and providing his father with counselling services. Id.

A month later, the social services caseworker handling the case received a report that the child had once again been treated for suspicious injuries, but she concluded that there was no

17

basis for action.   Id.   Over the next six months, the caseworker visited the DeShaney home monthly, where she observed many suspicious injuries and noticed that the child had not been enrolled in school.   Id. at 192-93.   Yet she did nothing more.   Id. at 193.   The father ultimately ended up beating the child into a coma and was later tried and convicted of child abuse.   Id. The child's mother thereafter brought a section 1983 action against the county and the social workers, claiming that they had violated her son's right to due process of law.   Id.   The district court granted summary judgment for the defendants and the Seventh Circuit affirmed.   Id.

   The Supreme Court also affirmed.   In doing so, the Court first articulated the above general rule—that the State has no affirmative obligation to ensure that private actors do not harm an individual's due process interests.   Id. at 197.   It then explained that, although there are "certain limited circumstances" in which "the Constitution imposes upon the State affirmative duties of care and protection" for "particular individuals," id. at 198, they all involve the State "tak[ing] a person into its custody and hold[ing] him there against his will," id. at 199-200.   In that circumstance, the "Constitution imposes" on the State "a corresponding duty to assume some responsibility for his safety and general well-being."   Id.   According to the Court, that "affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."   Id.   The Court then noted that the harms the child suffered "occurred not while he was in the State's custody, but while he was in the custody of his natural father," and that "[w]hile the State may have been aware of the dangers that" the child faced, "it played no part in their creation," did nothing "to render him any more vulnerable to them," and "placed him in no worse position than that in which he would have been had it not

18

acted at all." Id. at 201. The Court thus concluded that "the State had no constitutional duty to protect [the child] against the father's violence," and "its failure to do so—though calamitous in hindsight—simply does not constitute a violation of the Due Process Clause." Id. at 202.

In the wake of DeShaney, the Seventh Circuit has recognized "[t]wo 'exceptions'" to DeShaney's general rule. Monfils v. Taylor, 165 F.3d 511, 516 (7th Cir. 1998). The first is the "special relationship" exception: "when the state has a 'special relationship' with the person such as when it has custody over a person, it must protect him because no alternate avenues of aid exist." Doe v. Vill. of Arlington Heights, 782 F.3d 911, 916 (7th Cir. 2015) (cleaned up). "The basis of a special relationship is that the state has some sort of control or custody over the individual, as in the case of prisoners, involuntarily committed mentally ill persons, or foster children." Monfils, 165 F.3d at 517; see also First Midwest Bank Guardian of Est. of LaPorta v. City of Chi., 988 F.3d 978, 988 (7th Cir. 2021) ("The special-relationship exception did not apply in DeShaney for the obvious reason that the injured child was not in state custody.").

The second is the "state-created danger" exception: "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced," it may be liable. Doe, 782 F.3d at 916 (cleaned up). This exception "arises only by implication from a brief observation in the Court's [DeShaney] opinion," where the Supreme Court "explained that although the county and its social workers 'may have been aware' of the dangers the child faced in his father's home, they 'played no part in the[ ] creation' of those dangers." First Midwest, 988 F.3d at 988 (quoting DeShaney, 489 U.S. at 201). As the Seventh Circuit explained in Weiland v. Loomis, this exception "has been elaborated and turned into a 'three-part test.'" 938 F.3d 917, 920 (7th Cir. 2019). "First, the state, by its affirmative acts, must create

19

or increase a danger faced by an individual." Id. (citation omitted). "Second, the failure on the part of the state to protect an individual from such a danger must be the proximate cause of the injury to the individual." Id. (citation omitted). And "[t]hird, the state's failure to protect the individual must shock the conscience." Id. (citation omitted).

The Weiland court questioned the validity of the exception itself and the three-part test, noting that "[n]one of the[ ] elements has its provenance in DeShaney." Id. at 921. It suggested that "[i]f taken literally," the test might have "justified liability in DeShaney" itself. Id. The court thus cautioned that lower "courts cannot create an 'exception' to DeShaney that contradicts th[e] principle" that the state has no constitutional duty to "protect its residents from private violence," and thus cannot "treat the 'state-created danger exception' as a rule of primary conduct forbidding any acts by public officials that increase private dangers." Id. at 919. In the end, though, the court left it to "some future case" to consider whether the exception and test should be revisited. Id. at 921.

That "future case" does not appear to have yet come to pass. Indeed, the Seventh Circuit continues to recognize the state-created danger exception and apply its three-part test. See, e.g., Rakes v. Roederer, 117 F.4th 968, 970-92 (7th Cir. 2024) (per curiam) (multiple opinions analyzed the state-created danger exception and analyzed the three-part test); Est. of Her v. Hoeppner, 939 F.3d 872, 876 (7th Cir. 2019). This court is thus "[d]uty bound" to follow it. Rakes, 117 F.4th at 992 (Scudder, J., opinion) (noting that even though "the Justices have yet to answer . . . whether the Due Process Clause, while disallowing duty-to-protect claims, allows a claim in facts and circumstances where state actors create the danger that proximately causes harm to an individual," the Seventh Circuit "is among those that have recognized a claim for

state-created dangers"); see also Wright v. Shumate, No. 23 C 4734, 2024 WL 689990, at *3 n.6
(N.D. Ill. Feb. 20, 2024) ("[T]his Court recognizes the state-created danger exception and
analyzes Wright's claim using the three-part test.").   The court therefore analyzes plaintiff's due
process claims here under both the special relationship exception and the state-created danger
exception (along with its three-part test).

The DCFS defendants argue that neither exception applies.   As for the special
relationship exception, they say it does not apply because plaintiff was not in state custody.
And as for the state-created danger exception, they argue that the DCFS defendants did not
affirmatively place A.R. in a position of danger that she would not otherwise have faced.
According to the DCFS defendants, the State did not create or increase a danger: "A.R. faced
danger from her mother and grandmother both before and after DCFS became involved."   Nor,
they argue, was DCFS the proximate cause of the injury; the proximate cause was the mother
and her grandmother.   And, they contend, "while the Complaint alleges that the DCFS
employees were negligent in the performance of their duties," "negligence is not conduct that
'shocks the conscience.'"   (Citing Weiland, 938 F.3d at 920).

As for plaintiff, he alleges in his complaint that the DCFS defendants "created and
increased A.R.'s risk for abuse" "by performing sham investigations" and "declaring repeated
claims of abuse and neglect as unfounded," which, he says, "emboldened and encouraged A.R.'s
abusers to physically abuse and neglect her."   Plaintiff echoes this allegation in his response to
the motion to dismiss, where he argues that "it was not that the DCFS Defendants failed to act,
but that they took active steps to falsify reports, falsely categorize allegations as unfounded, and
encourage the Abusers—A.R.'s mother, grandmother, and uncle—to continue their abuse of

Plaintiff A.R by informing them of these conclusions." The complaint, he further points out, is "replete with facts that were not investigated," and lists them. Plaintiff also argues that the complaint contains facts detailing how A.R.'s mother and grandmother "were notified of the findings against them."

The DCFS defendants argue in reply that the allegations about falsifying reports and falsely categorizing allegations as unfounded are conclusory and without factual basis, that allegations that the DCFS defendants notified A.R.'s mother and grandmother of their findings do not support any claim, and that allegations identifying facts that were not investigated "fall squarely within" <u>DeShaney</u>'s grasp.

The court notes that plaintiff also suggests—for the first time—in her opposition to the DCFS Defendants' related motion to stay this case pending resolution of this motion, that the special relationship exception should apply here because "DCFS belatedly removed A.R. from her drug addict mother's custody, but instead of putting her in Plaintiff's custody, put her in Marmitt's custody, directly placing her within dangerous bounds from which, as a child, she could not escape."

Although the parties argue in generalities about the allegations, the court believes that, given the number of defendants, and the differences in allegations, it makes sense here to examine the allegations in chronological order—and starting with specific individual defendants—in order to determine if plaintiff has pleaded sufficient facts to state a cause of action.

**<u>Fabian and Sunday.</u>** Plaintiff alleges that Fabian was assigned to investigate the July 2019 report that alleged that M.G. was abusing and neglecting A.R. but that Fabian "conducted a

sham investigation," "[o]mitted information from her report, and/or inserted false information in the report of her investigation, and/or otherwise created an inaccurate report." According to plaintiff, Fabian "knew or suspected A.R. was at risk for and subjected to abuse and neglect" yet "consciously ignored and failed to stop the abuse" and "falsely categorized the July 2019 allegations of abuse as 'unfounded' due to insufficient evidence" "despite M.G. completing a drug test which indicated that she was positive for opiates, for which she was not prescribed, thus corroborating the reporters' concerns that A.R. was surrounded by family members abusing drugs."

The court finds that plaintiff has not pleaded a plausible claim against Fabian under either exception. For starters, plaintiff has not pleaded a plausible claim that Fabian can be liable under the special relationship exception. To be liable under that exception, "the state must have custody over the child." Waubanascum v. Shawano Cnty., 416 F.3d 658, 665 (7th Cir. 2005) (emphasis in original); see also First Midwest Bank, 988 F.3d at 988 ("The special-relationship exception did not apply in DeShaney for the obvious reason that the injured child was not in state custody."). Plaintiff here does not allege that A.R. was in DCFS's custody at the time that Fabian was involved.

Turning to the state-created danger exception, the exception is "narrow" and "applies only in rare and often egregious circumstances." Wilson-Trattner v. Campbell, 863 F.3d 589, 593 (7th Cir. 2017) (cleaned up). To get past the pleading stage, plaintiff "must allege facts supporting" each of the "three elements." Wright, 2024 WL 689990, at *3.

Plaintiff cannot clear the first element here—whether the state's affirmative acts created or increased a danger. The Seventh Circuit has explained that "to 'create or increase' must not

23

be interpreted so broadly as to erase the essential distinction between endangering and failing to protect and thus circumvent <u>DeShaney</u>'s general rule." <u>Doe</u>, 782 F.3d at 917 (cleaned up). "When courts speak of the state's 'increasing' the danger of private violence, they mean the state did something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence." <u>Sandage v. Bd. of Comm'rs</u>, 548 F.3d 595, 600 (7th Cir. 2008). In other words, the state's affirmative, intervening act must move the victim from a position of safety to a position of danger. <u>Id.</u> at 598. Even if the action could be considered "affirmative," the court "must then ask what new danger would have otherwise befallen the victim." <u>Windle v. City of Marion, Ind.</u>, 321 F.3d 658, 662 (7th Cir. 2003). The plaintiff thus must allege facts that support that the state "failed to protect [the individual] from a danger they created or made worse." <u>Id.</u> (emphasis removed). In short, the court must ask: "What actions did the state actor affirmatively take, and what dangers would the victim otherwise have faced?" <u>Id.</u> at 661 (cleaned up).

Plaintiff's claim against Fabian does not plausibly plead that the Fabian committed affirmative acts that created or increased a danger. To begin, even if conducting a sham investigation, omitting information from a report, inserting false information in the report, or creating an inaccurate report were affirmative acts, plaintiff fails to allege that those actions here plausibly created or made worse a danger. That is because the court "can only speculate whether [Fabian] made [A.R.] worse off, whether by" not investigating sufficiently, omitting information, a falsely claiming that the July 2019 allegations were unfounded. <u>Doe</u>, 782 F.3d at 918.

24

Doe is instructive here.    There, the plaintiff was a minor female who was drinking vodka with three males at an apartment complex.    Id. at 913.    The apartment manager called the police to report them.    Id.    An officer responded and saw a very intoxicated Doe being held up by the males.    Id.    The officer told the males to take Doe home and then he let them leave the scene. Id.    He then falsely reported to dispatch that the subjects were gone when he arrived, and he also called off another officer who had been dispatched to the scene.    Id.    Doe was later sexually assaulted by one of the males.    Id.    The plaintiff filed a lawsuit against the officer and the village he worked for, asserting, among other things, a section 1983 claim against the officer. Id.    The district court dismissed the complaint, finding that there was no constitutional duty to protect Doe and that the officer was entitled to qualified immunity.    Id. at 914-16.    The Seventh Circuit affirmed.

In doing so, the court held that the state-created danger exception did not apply and that even if it did, the officer was entitled to qualified immunity.    Id. at 916-18.    According to the court, the case was not one "in which Doe was safe, or even considerably safer, before [the officer] acted."    Id. at 918.    Indeed, "[h]is alleged conduct did not turn a potential danger into an actual one; Doe was in actual danger already."    Id.    The court further explained that "[n]ot even the allegations that [the officer] called off [another officer] (or falsely reported to dispatch that the subjects were gone) created or increased the danger to Doe."    Id.    That is because, the court explained, "[h]ad [the officer] had not called off [the other officer] or falsely reported to dispatch, we have no way of knowing what would have happened.    [The other officer] might have failed at protecting Doe."    Id.    Thus, the court concluded, unlike in a situation where "the chances of a successful rescue [a]re high, and there [i]s a direct connection between the

[defendant]'s actions and the" harm to the victim, the court could "only speculate whether [the officer] made Doe worse off, whether by calling off [the officer] or falsely reporting to dispatch." Id.

Here, as in Doe, the court can "only speculate whether" Fabian made A.R. "worse off, whether by" allegedly omitting facts or falsifying that the reported allegations were unfounded. Id. This is not a case in which the defendant falsely or misleadingly told the victim herself information that caused her to move into a dangerous situation. See Rakes, 117 F.4th at 975 (Ripple, J. opinion) (explaining that police officer's misrepresentation to the victim that her abusive husband had been detained for 24 hours created a danger that the victim would be at home when the husband returned to the house).

Nor does plaintiff's allegation that Fabian's conduct "emboldened and encouraged A.R.'s abusers to physically abuse and neglect her" save her claim. Indeed, in Wilson-Trattner, the Seventh Circuit rejected the plaintiff's argument there that police officers' failure to intervene in a domestic dispute "implicate[d] a state-created danger because [they] 'conveyed the unmistakable message' to [an abusive boyfriend] that they would not interfere with his on-going abuse, thereby emboldening him to reoffend." 863 F.3d at 593. The plaintiff had filed a § 1983 claim against a county sheriff and several of his deputies for their failure to adequately protect her from her abusive boyfriend. She reported her boyfriend's conduct to the sheriff's department, and the defendants advised her to seek a protective order. Id. at 592. The boyfriend was then arrested after an explosive episode at the victim's home. Id. She then sued, alleging that the defendants inadequately responded to her complaints, causing her boyfriend to continue abusing her with impunity. Id. at 593-54. The Seventh Circuit held that the

26

defendants had no constitutional duty to protect the victim from her boyfriend's private acts of violence, and that the state-created exception did not apply. Id. at 593-96.

In doing so, the court noted that there was "no evidence that any officer directly encouraged [the boyfriend] or otherwise told him that he could abuse [the victim] with immunity." Id. at 594. And it held that the "more general argument that the [defendants'] dismissive and indifferent attitudes to each of the incidents . . . endangered her by progressively emboldening" the boyfriend, was "squarely foreclosed by DeShaney": "[E]ven if the [defendants'] failure to intervene ultimately increased the danger to [the victim] by indirectly emboldening [the boyfriend] to continue to mistreat her, that would not distinguish her case from DeShaney." Id.

As in Wilson-Trattner, there is no allegation here that Fabian "directly encouraged [M.G.] or otherwise told [her] that [s]he could abuse [A.R.] with immunity." Id. And any argument about Fabian "indirectly emboldening" M.G. is "squarely foreclosed by DeShaney." Id. Plaintiff points to the fact that he alleges that "M.G. was notified of the result" of Fabian's report. But he does not explain how that makes his "indirect emboldening" claim any more plausible.

Plaintiff does not attempt to distinguish these cases. He instead points to Griffin v. Poynter, in which a district court in the Central District of Illinois held that a plaintiff sufficiently alleged a claim under the state-created danger exception by alleging that the DCFS defendants there "falsif[ied] reports of abuse, conclud[ed] those reports were unfounded, and conduct[ed] sham investigations which emboldened and encouraged [the abusers] to continue abusing [the victim minor]." No. 20-cv-1427, 2021 WL 4495906, at *9 (C.D. Ill. Sept. 9, 2021). To be

27

sure, the allegations in <u>Griffin</u> are strikingly similar to those at issue here and survived a motion to dismiss. <u>Compare Griffin</u>, No. 20-cv-1427 at Doc. 3 at pp. 5-6 and <u>id.</u> at pp. 14-16, <u>with</u> Doc. 1 at pp. 6-8 and 27-29. But this court respectfully disagrees with the <u>Griffin</u> court's conclusion that those allegations stated a plausible claim. And it notes that although the <u>Griffin</u> court cited <u>Doe</u> and block quoted it, it did not attempt to distinguish it, <u>see id.</u> at *7-9, and it failed to cite <u>Wilson-Trattner</u>.

And even if those types of allegations could state a cognizable claim, they would still fail for another reason: "'[m]ere conclusory statements,' such as the ones here, 'are insufficient to survive a motion to dismiss.'" <u>Wright</u>, 2024 WL 689990, at *4 (quoting <u>Doe</u>, 782 F.3d at 915) ("respectfully disagree[ing] with the conclusion in <u>Griffin</u>" that the allegations that DCFS defendants "conducted a 'sham' investigation, falsified information in their reports, and omitted information from their reports suffice to support a substantive due process claim"). Indeed, "claims of falsified reports and omitted facts, without allegations of what Defendants falsified or omitted from the reports, are conclusory." <u>Id.</u> (dismissing section 1983 claims against DCFS employees). The DCFS defendants argue that plaintiff "nowhere says in what way the reports were supposedly falsified." Plaintiff does not meaningfully dispute this. While plaintiff alleges that "Fabian categorized the abuse as 'unfounded' despite M.G. completing a drug test which indicated that she was positive for opiates, for which she was not prescribed, thus corroborating the reporters' concerns that A.R. was surrounded by family members abusing drugs," he does not allege that Fabian knew of the drug test or that this was omitted from the report or made the ultimate "unfounded" determination "false" or a "sham." <u>See id.</u>

The court further notes that plaintiff has injected ambiguity into the complaint by using the "and/or" conjunction in alleging Fabian's conduct—namely, that Fabian "[o]mitted information from her report, and/or inserted false information in the report of her investigation, and/or otherwise created an inaccurate report." See Turner v. Mercedes-Benz USA, LLC, No. 1:19-cv-04141, 2020 WL 5642195, at *3 (S.D. Ind. Sept. 22, 2020) ("Turner fails to allege sufficient or plausible detail about MBUSA, MRAG, and RCP to move beyond the ambiguity presented by his use of the 'and/or' conjunction."). A complaint must "give the defendant[s] fair notice of what claim[s] the plaintiff is making and what the basis for [those] claims [are]." McCray v. Wilkie, 966 F.3d 616, 620 (7th Cir. 2020). And as the DCFS Defendants further note, the fact that plaintiff appears to have "simply 'copy and paste[d]' allegations" from the complaint in the Griffin case undermines their plausibility. Cf. Molina v. City of Maywood, No. CV 08-3105 ODW (SHX), 2008 WL 4057105, at *2 (C.D. Cal. Aug. 27, 2008) ("[T]he fact that Plaintiffs counsel has cut and pasted the same insufficient allegations in all nine of the related Maywood cases, without tailoring any of them to the unique facts of each case, completely undermines the credibility and genuine nature of his client's claims.").

In short, plaintiff has not alleged a plausible section 1983 due process claim against Fabian.

The allegations against defendant Sunday fail for similar reasons. Plaintiff alleges that Fabian met with Sunday about her findings and that Sunday "knew or should have known" that Fabian conducted a sham investigation and had included false information in her report "and/or" omitted information from her report "and/or otherwise created an inaccurate report." Yet, plaintiff alleges, Sunday, "with deliberate and reckless indifference," approved "and/or" directed

29

Fabian's conduct by agreeing with Fabian's findings and concluding that the allegations of abuse and neglect were "unfounded."

As with Fabian, the special relationship exception does not apply to Sunday because plaintiff alleges that A.R. was in the custody of her biological mother—not the State—at the time of Sunday's alleged conduct.   See First Midwest Bank, 988 F.3d at 988 ("The special-relationship exception did not apply in DeShaney for the obvious reason that the injured child was not in state custody.").   And plaintiff fails to allege a plausible claim under the state-created danger exception because plaintiff cannot meet the first element of the state-created danger exception.   Even if Sunday's alleged conduct were considered an affirmative act, her "alleged conduct did not turn a potential danger into an actual one; [A.R.] was in actual danger already," and the court can "only speculate whether [Sunday] made [A.R.] worse off."   Doe, 782 F.3d at 918.   Nor is there any allegation that Sunday "directly encouraged [M.G.] or otherwise told [her] that [s]he could abuse [A.R.] with immunity," and any argument about Sunday "indirectly emboldening" M.G. is "squarely foreclosed by DeShaney."   Wilson-Trattner, 863 F.3d at 594. And, finally, the allegations against Sunday are conclusory: there are no specific factual allegations about how Sunday supposedly "knew or should have known" that Fabian's report was false or a sham—to say nothing of the fact that plaintiff again injects ambiguity with the "and/or" conjunction.   Plaintiff has therefore failed to allege a plausible section 1983 due process claim against defendant Sunday.

**Griffin and Wooten.**   Turning to the allegations against Griffin and her supervisor, Wooten, arising from the second and third investigations related to February 2020 reports of abuse and neglect by M.G. and Marmitt, plaintiff alleges essentially the same things as he did for

30

Fabian and Sunday, but without any allegation about a drug test and with the addition of an allegation that Griffin failed to request police reports that would have revealed several reports over disturbances involving M.G., Marmitt, or Jacob.   These allegations fail for the same reasons discussed above.   And the allegation that Griffin would have discovered the police reports had she investigated more thoroughly are allegations that fall within <u>DeShaney</u>'s reach.

Plaintiff's next set of allegations, though, add a wrinkle here.   He alleges that in March 2020, DCFS opened its fourth investigation on A.R. based on a hotline call reporting that M.G. was neglecting A.R., and that M.G was "indicated" two months later, on May 4, 2020, for placing A.R. in close proximity to drugs and thus posing a substantial risk of physical injury and neglect to A.R.   Plaintiff further alleges that as of March 5, 2020, "M.G. was no longer allowed to reside in the same home as A.R." and that on March 20, 2020, M.G. signed a "DCFS Appointment of Short-Term Guardianship" under 755 ILCS 5/11-5.4, whereby she designated Marmitt as A.R.'s short-term guardian.   According to plaintiff, Griffin was assigned to ensure that the short-term placement with Marmitt was appropriate, but "began to conduct a sham investigation," which was approved "and/or" directed by Wooten.   Griffin and Wooten, he alleges, "knew or should have known that Marmitt's abuse and neglect of A.R. would continue when they made the decision to place A.R. with Marmitt and allowed her to be appointed as A.R.'s short-term guardian."

As noted above, plaintiff suggested for the first time in his opposition to the DCFS Defendants' motion to stay that the special relationship exception applies here because "DCFS belatedly removed A.R. from her drug addict mother's custody, but instead of putting her in Plaintiff's custody, put her in Marmitt's custody, directly placing her within dangerous bounds

from which, as a child, she could not escape." To be sure, there are cases in which DCFS's placement of a minor with foster parents or even relatives gives rise to a special-relationship and thus due process protections. But in those cases, DCFS had assumed custody or guardianship over the minor. See Camp v. Gregory, 67 F.3d 1286, 1292 (7th Cir. 1995) ("DCFS had a cognizable duty to protect Anthony as his guardian"); see also J.H., 346 F.3d at 791 ("[C]hildren in state custody have a constitutional right not to be placed in a foster home where the state knows or suspects that the children may be subject to sexual or other abuse."); K.H. through Murphy v. Morgan, 914 F.2d 846, 852-53 (7th Cir. 1990) (setting forth an "exceedingly narrow formulation of the right to safe foster care"—that is, "the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, whom the state knows or suspects to be a child abuser" (emphasis removed)); cf. Reed v. Palmer, 906 F.3d 540, 553 (7th Cir. 2018) (complaint alleged that plaintiffs were in the "custody of" the state actor defendant).

Although plaintiff here argues in his response to the stay motion that DCFS "removed" A.R. from M.G.'s "custody," he conspicuously does not allege in his complaint or assert in his opposition to the motion to dismiss—where the DCFS defendants expressly argued that DCFS never had custody over A.R.—that DCFS (or Griffin or Wooten) removed A.R. or otherwise assumed custody or guardianship of A.R. In fact, the complaint expressly alleges that M.G. had custody from A.R.'s birth until March 20, 2020, the date on which M.G. turned over short-term guardianship to Marmitt and Marmitt took over custody of A.R. True, the complaint does allege that DCFS eventually "took protective custody" over A.R. But that was not until August 2022—after Griffen and Wooten's (and, for that matter, every other defendant's) involvement.

32

That is a "key point" here. Camp, 67 F.3d at 1292 ("the fact that the DCFS had been made Anthony's guardian [by court order] represents a key point of distinction from DeShaney"); see DeShaney, 489 U.S. at 201 n.9 ("Had the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect."); cf. Stevens v. Umsted, 131 F.3d 697, 702-03 (7th Cir. 1997) (distinguishing K.H. and Camp based on the fact that the minor in the case before it "was not taken into custody by the state" and "the state never became the legal guardian of [him]"). And although plaintiff alleges that Griffin and Wooten "made the decision to place A.R. with Marmitt," that conflicts with the complaint, which again asserts that M.G. is the one who transferred "short-term" custody to Marmitt.

Based on the allegations in the complaint—and with only plaintiff's barebones argument made in response to a separate (albeit related) motion—plaintiff has not plausibly pleaded facts that would support that Griffin or Wooten assumed a role that made them constitutionally liable under the special relationship exception.

As for the state-created danger exception, plaintiff has not argued that the placement implicates this exception. But that argument would fail here, anyway. Even if plaintiff had sufficiently and plausibly pleaded that Griffin and Wooten took custody or control over A.R. and affirmatively acted to place her in Marmitt's custody—and thus were the actors responsible for creating or increasing a danger, see Weiland, 938 F.3d at 920 (prison guard defendant "Loomis did not create danger by transferring Salters to the Hospital; that decision was made by others")—it is questionable whether that conduct created or increased the danger. Indeed, A.R.

33

was allegedly already in danger in the custody of M.G., who was allegedly associating with Marmitt.  But see S.S. v. McMullen, 225 F.3d 960, 963 (8th Cir. 2000) (en banc) (noting that in K.H. "[t]he state affirmatively exposed the plaintiff to a different danger from the one from which she was removed, that is, the state placed her in a foster home, and it was that act that was held to be actionable" (emphasis added)).

Regardless, plaintiff has not plausibly pleaded the third factor of the test—that Griffin and Wooten's conduct shocks the conscience.   For the DCFS employees to be liable, "the conduct must be more culpable than mere negligence, which is 'categorically beneath the threshold of constitutional due process.'"  King v. E. St. Louis, 496 F.3d 812, 819 (7th Cir. 2007) (Cty. of Sacramento v. Lewis, 523 U.S. 833, 850 (1998)).   In fact, "even gross negligence does not suffice to give rise to liability under § 1983."  Lewis v. Anderson, 308 F.3d 768, 773 (7th Cir. 2002).   Rather, "governmental defendants must act with a *mens rea* akin to criminal recklessness for constitutional liability to attach."  Hoeppner, 939 F.3d at 877.   And "[o]nly 'the most egregious official conduct' will satisfy this stringent [shock-the-conscious] inquiry." First Midwest Bank, 988 F.3d at 989 (citation omitted).

Here again, plaintiff only conclusorily pleads that Griffin and Wooten's investigation was a sham that was based on omitted, false, or inaccurate information.   The only non-conclusory allegation is that if Griffin had looked at police reports that she inquired about, she would have discovered several reports of disturbances involving M.G., Marmitt, or Jacob.   Given this—and the fact that A.R.'s own grandmother obtained custody—the allegations at most "make out a case for negligence only."  McMullen, 225 F.3d at 964 (affirming dismissal of section 1983 claim against family service employees after they released the minor from state custody and returned

34

her to her father despite having notice that her father was allowing her to have contact with the known pedophile who subsequently abused her).   "[T]here is indeed a difference between placing a child with a member of her family and placing the child with a foster parent."   K.H., 914 F.2d at 852.   That difference springs from the fact that "[s]tate employees who withhold a child from her family run the risk of being sued by the family for infringing their liberty of familial association, . . . and we do not want to place child welfare workers on a razor's edge— damned if they return the child to its family and damned if they retain custody of the child or place him in a foster home or institution."   Id. at 853 (distinguishing case in which an aunt— "not a foster parent"—was awarded custody); see also Camp, 67 F.3d at 1294 (noting the family member/foster parent distinction but explaining that the familial-relationship issue was not a "concern" because the aunt that had custody had already once "sought to terminate her guardianship" and "DCFS did not relinquish its guardianship" when it later returned the minor to the aunt).

"Viewing the plaintiff's allegations in a light most favorable to [his] recovery, [the court] cannot say that they describe the kind of conduct that violates substantive due process rights." McMullen, 225 F.3d at 964.

**The remaining allegations.**   Moving on to plaintiff's remaining allegations, they are of the same variety as the Fabian and Sunday allegations—they allege that there continued to be reports of abuse but the investigators and supervisors conducted sham investigations and omitted or falsified investigative reports, which allegedly emboldened A.R.'s abusers.   These allegations fail for the same reasons discussed above.   At the end of the day, they fall within DeShaney's reach.   See DeShaney, 489 U.S. at 192-93 (finding no section 1983 liability even though the

35

caseworker received a report that the child had again been treated for suspicious injuries and over a six-month period observed many suspicious injuries yet concluded that there was no basis for action and did nothing).

In sum, although the allegations might support that one or more of the defendants was negligent in their actions, with serious and concerning adverse consequences to A.R., the complaint does not sufficiently allege that defendants can be liable for violating a constitutional duty in light of DeShaney.   The court therefore dismisses the section 1983 claims.

Qualified Immunity

Because the court dismisses the section 1983 claims based on DeShaney, the court will not address defendants' qualified immunity argument.   See Wright, 2024 WL 689990, at *5 n.7.

**State Claims**

With the section 1983 claims dismissed, there are only state law claims left in this case. Defendants argue that state sovereign immunity requires dismissal of those claims to the Illinois Court of Claims.   But because the court has dismissed the only federal claims in the complaint, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims.   See 28 U.S.C. § 1367(c); Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").   The court thus dismisses plaintiff's state law claims without prejudice.

**CONCLUSION**

The court grants the DCFS defendants' motion to dismiss [Doc. 41] as to the two federal section 1983 claims.   The court notes that it is dismissing those claims as to all defendants,

including Capone, who plaintiff alleges was also a DCFS employee. The court thus denies as moot Capone's separate motion to dismiss [Doc. 38]. Because the court is dismissing the section 1983 claims, the court declines to exercise supplemental jurisdiction over plaintiff's state law claims and thus dismisses them without prejudice. And because the court has dismissed all claims, it also denies as moot the DCFS defendants' motion to stay discovery pending resolution of their motion to dismiss [Doc. 60].

So ordered.

ENTER:

Robert W. Gettleman
United States District Judge

DATE:     January 29, 2025

37